IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Nicholas Charles Secret, | ) | |
|     Petitioner, | ) | |
| | ) | |
| v. | ) | **1:19cv1386 (LO/TCB)** |
| | ) | |
| Commonwealth of Virginia, | ) | |
|     Respondent. | ) | |

### MEMORANDUM OPINION

Virginia inmate Nicholas Charles Secret ("Secret" or "petitioner") filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging the validity of his convictions—entered in the Circuit Court of Louisa County—of arson and attempted murder in the first degree. See Dkt. No. 1. Respondent has filed a motion to dismiss and Rule 5 Answer, supported by a legal brief. See Dkt. Nos. 4-6. Petitioner, despite having been provided the notice required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) [Dkt. No. 7], did not file an opposition to respondent's motion. For the reasons explained below, respondent's motion to dismiss will be granted, and Secret's petition for writ of habeas corpus will be dismissed.

### I. Background

On January 30, 2015, in the Circuit Court of Louisa County, a jury convicted Secret of one count of arson and nine counts of attempted first-degree murder. Record No. 170540, p. 569. On June 20, 2015, the trial court sentenced petitioner to twenty-three years' incarceration. Id. at p. 571. This conviction and sentencing represented the culmination of events that began to transpire approximately a year-and-a-half earlier.

In September 2013, petitioner met Paxus Calta, a member of the "Acorn Community," an intentional community then consisting of approximately thirty individuals. Id. at pp. 739-40.

Calta invited Secret to come to Acorn as a guest and did not specify any particular end-date with regard to petitioner's invitation. Id. at p. 740. The majority of the individuals at Acorn resided in a dwelling known as "Heartwood," a dormitory-style building that contained bedrooms, an office, a kitchen, and a dining room. Id. Although petitioner attended meetings and ate some of his meals there, while "guesting" at Acorn, petitioner resided not in Heartwood, but in a tent on the community's grounds. Id.

After a week at Acorn, Secret requested to extend his stay and to remain in the community as an intern. Id. After initially deferring a decision with respect to petitioner's request, the Acorn community eventually "looked at [their] numbers [and] realized [they] weren't going to have bedrooms for [Secret] and some other people after Thanksgiving." Id. Consequently, "[Calta] told [Secret] that he was going to have to find someplace else to go just before Thanksgiving." Id. Calta also advised Secret that he was "making members feel uncomfortable [because] his behavior had been somewhat odd and that if his behavior [did not improve] he would have to leave immediately rather than just before Thanksgiving." Id.

Two weeks later, on the morning of October 12, 2013, Calta was using a computer in the office on the first floor of Heartwood when he smelled smoke; he then discovered a fire burning in the kitchen. Id. at pp. 740-41. Calta and another Acorn member yelled to the occupants of Heartwood that the building was on fire. Id. at p. 741. All of the occupants escaped without serious injury. Id. At trial, the identities of at least nine individuals who were in Heartwood at the time of the fire were established. Id. As those individuals exited Heartwood, they detected gasoline or diesel fuel spread throughout the building; Calta, for instance, found fuel cans in the residence and carried them outside. Id. After the fire was extinguished, the residents of the

2

Acorn Community conducted a headcount and determined that everyone was accounted for with the exception of petitioner.

Special Agent Peter Lazear of the Virginia State Police investigated the Heartwood fire and opined at petitioner's trial that the blaze was not the result of an accident. Id. Instead, spread throughout the residence, Lazear found traces of gasoline, containers full of diesel fuel and paint thinner, as well as "a heavy petroleum distillate." Id. Taking into account the "depositing of soot from very thick, heavy dark smoke that ... was starting to move into the center of the structure," Lazear concluded that the fire would have "engulf[ed]" the entire structure had it not been successfully extinguished.

Lazear also conducted interviews with Acorn members on the day of the fire and learned of Secret's "odd" behavior and sudden absence. Id. at p. 742. On that basis, Lazear designated Secret a suspect in the investigation. Id. Due to Secret's absence, however, Lazear left Acorn without speaking to him. Id. Later that night, though, Lazear received word that Secret had returned to Acorn. Id. Lazear accordingly ventured back to Louisa County and met Secret and another state police official at the County Sheriff's Office. Id.

Lazear and Secret spoke in an interview room for approximately thirty minutes before the topic of the fire arose. Id. at p. 743. Lazear then asked petitioner, "what about Acorn made you start the fire in the kitchen this morning?" Id. Approximately ten minutes later, Secret stated, "I dumped a whole bunch of fuel in there, then threw a thing full of lit matches into some of the fuel." Id. Only then did Lazear Mirandize petitioner. Id. Petitioner, though, waived his rights and continued to speak with Lazear. Id. Over approximately the next thirty minutes, Secret "provided detailed inculpatory statements about his actions in setting fire to Heartwood." Id. Secret was arrested and later indicted. Id.

3

Petitioner subsequently filed a pre-trial motion to suppress all of the statements—pre- and post-<u>Miranda</u>—that he made to Lazear at the Sheriff's Office. <u>Id.</u> The trial court granted the motion with respect to petitioner's pre-<u>Miranda</u> statements but denied the motion with respect to the statements petitioner made following provision of <u>Miranda</u> warnings. <u>Id.</u> at p. 747. Consequently, several of petitioner's self-incriminating statements were introduced against him at trial. <u>See, e.g.</u>, <u>id.</u> at pp. 394-395. The jury ultimately convicted petitioner of arson of an occupied dwelling and nine counts of attempted murder. <u>Id.</u> at p. 748.

## II. Post-Conviction Procedural History

Following his conviction, petitioner filed a motion to set aside the verdict, renewing his argument that his post-<u>Miranda</u> statements should have been suppressed and asserting that there was insufficient evidence to convict him with respect to his specific intent as to each of the counts of attempted murder. <u>Id.</u> at p. 748. The trial court denied the motion as to both issues. <u>Id.</u> Secret then appealed the rulings to the Court of Appeals of Virginia, where he additionally raised an argument that the trial court erred in refusing to present a proffered jury instruction related to the intent necessary to prove an attempted crime. <u>Id.</u>; Record No. 0853-15-2, p. 38. The state appellate court found no error and thus affirmed the convictions. Record No. 0853-15-2, pp. 77-97. The Supreme Court of Virginia then awarded an appeal. <u>See id.</u> at p. 121. There, petitioner did not renew his assignment of error regarding the jury instruction. <u>See</u> Record No. 170540. On October 11, 2018, a unanimous Supreme Court of Virginia affirmed petitioner's convictions. <u>Id.</u>

Finally, on October 8, 2019, Secret filed the instant petition for writ of habeas corpus. <u>See</u> Dkt. No. 1. In it, he raises the following three claims, verbatim:

1. The petitioner's constitutional rights under the 5th and 14th Amendments and as enunciated in <u>Miranda</u>, <u>Siebert</u> and <u>Elstad</u>, were violated by the use of an illegal two-step

4

interrogation and the Virginia Supreme Courts appeal denial was contrary to clearly established federal law and was also unreasonable in light of the facts presented.

2. The petitioner's constitutional rights under the 5th and 14th Amendments were violated when the Commonwealth failed to prove, at trial, the requisite intent and the Virginia Supreme Court's appeal denial was contrary to federal law and was also unreasonable in light of the facts presented.

3. The petitioner's constitutional rights under the 5th and 14th Amendments were violated by the trial court's refusal to properly instruct the jury as to intent and the Virginia Supreme Court's appeal denial was contrary to clearly established federal law and was also unreasonable in light of the facts presented.

Dkt. No. 1-1, p. 10.

### III. Standard of Review

To obtain federal habeas relief, a state prisoner must demonstrate that he or she is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits a federal court's authority to grant habeas relief. Pursuant to AEDPA, when a state court has addressed the merits of a claim raised in a subsequent federal habeas corpus petition, the reviewing federal court may not grant the petition on that particular claim unless the state court's adjudication was (1) contrary to or an unreasonable application of clearly established federal law or (2) was based on an unreasonable determination of the facts presented at the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2). The question, then, "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)).

A state court's decision is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially

indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A federal court should grant relief under the "unreasonable application" clause if it finds that the state court "identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

In determining whether a state court's decision was based on an unreasonable determination of the facts unearthed at its own proceeding, a federal court reviewing a habeas petition "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. 2254(e)(1)). "The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was 'too powerful to conclude anything but [what the petitioner claims],' and when a state court's finding was 'clearly erroneous.'" Landers v. Warden, Atty. Gen. of Ala., 776 F.3d 1288, 1294 (11th Cir. 2015) (quoting Miller–El, 545 U.S. at 265).

To consider a claim in the first instance, a federal court must first ensure that the petitioner exhausted that claim in the state court system. 28 U.S.C. § 2254(b)(1)(A). But a successfully exhausted claim may nevertheless be deemed "procedurally defaulted" and barred from federal review if a state court denies that claim pursuant to an independent and adequate state ground. See Harris v. Reed, 489 U.S. 255, 259 (1989). And a federal habeas court may deem a claim not presented to the highest state court exhausted and barred from review "if it is clear that the claim would be procedurally barred under state law if the petitioner [belatedly] attempted to present it to the state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). Federal habeas petitioners may overcome procedural bars and receive review of their claims

through a showing of cause and prejudice, see Gray v. Netherland, 518 U.S. 152, 162 (1996), or actual innocence, see McQuiggin v. Perkins, 569 U.S. 383, 386 (2013).

## IV. Analysis

Secret's petition asserts summarily that the state courts' decisions with respect to his grounds for relief were contrary to federal law and rest upon shaky foundations of unreasonable factual determinations. See Dkt. No. 1-1, p. 10. Unfortunately, petitioner's briefing offers little by way of argument to demonstrate that this is the case. Indeed, because petitioner appears to have submitted in this case a brief drafted by his attorney and originally submitted to the Court of Appeals of Virginia in support of his direct appeal, compare Dkt. No. 1-1 with Record No. 0853-15-2, his arguments are not tailored to the deferential AEDPA standard under which this Court is constrained to review his petition. For the reasons explored below, this Court concludes that petitioner's bare assertions that the state court determinations were unreasonable or contrary to federal law are without support.

### 1.   *Claim One – Non-Suppression of Self-Incriminating Statements*

In Claim One, petitioner argues that the state courts incorrectly declined to suppress a selection of the statements he made to Special Agent Lazear at the Louisa County Sheriff's Department. See Dkt. No. 1-1, p. 10. He specifically argues that he was subjected to an improper two-step interrogation similar to the type proscribed by Missouri v. Seibert, 542 U.S. 600 (2004), and, in the alternative, that he was compelled to make involuntary self-incriminating statements subject to suppression pursuant to the voluntariness standard laid out in Oregon v. Elstad, 470 U.S. 298 (1985).

The state supreme court denied these arguments in a lengthy discussion of the relevant Supreme Court of the United States precedent. See Record No. 170540. It stated:

In *Elstad*, a police officer, upon arriving at Elstad's home to arrest him for burglary, questioned him about the burglary without first providing *Miranda* warnings. 470 U.S. at 300-01. The officer, as he later testified, asked Elstad "if he knew a person by the name of Gross [Elstad's neighbor], and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.'" *Id.* at 301. Elstad was subsequently transported to police headquarters where he was advised of his *Miranda* rights for the first time. He then indicated that he understood his rights, wished to speak to the arresting officers, and gave a "full statement," providing an oral and written confession regarding his role in the robbery. *Id.* at 301-302.

An Oregon state trial court, in ruling upon Elstad's motion to suppress these statements in his prosecution for the burglary, excluded his first inculpatory statement made at his home because he had not been advised of his *Miranda* rights. The court admitted into evidence, however, Elstad's written confession based upon the court's findings that it was "given freely, voluntarily and knowingly" after Elstad was advised of and waived his *Miranda* rights. *Id.* at 302. Following his conviction, Elstad appealed to the Oregon Court of Appeals, arguing that the trial court erred in admitting his post-warning written confession. *Id.* at 302-03. The appeals court agreed and reversed the conviction, reasoning that, "[r]egardless of the absence of actual compulsion, the coercive impact of [the earlier unwarned statement] remains, because in a defendants' mind it has sealed his fate." *Id.* at 303. The appeals court concluded that, because of the brief period of time separating Elstad's unwarned and warned statements, the "coercive impact" of the unwarned statement had not "dissipated." *Id.*

. . . . The Supreme Court ... reversed and remanded the case to the Oregon Court of Appeals. *Id.* at 318. The Supreme Court concluded that "the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id.*

In reaching this conclusion, the Supreme Court made clear that the exclusion of inculpatory statements based on the police's failure to administer *Miranda* warnings "does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Id.* at 310. Indeed, as the Court explained, the *Miranda* exclusionary rule "sweeps more broadly than the Fifth Amendment itself" because the Fifth Amendment only prohibits the use of compelled testimony by the prosecution in its case in chief. *Id.* at 306-07. As a result, "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda*'s preventive medicine provides a

8

remedy even to the defendant who has suffered no identifiable constitutional harm." *Id.*

However, once *Miranda* warnings have been administered to a suspect who has given an unwarned but voluntary inculpatory statement in response to non-coercive questioning, the remedial considerations underlying the *Miranda* exclusionary rule are no longer controlling in determining the admissibility of the subsequent warned statement. As the Supreme Court explained in *Elstad*, "[t]his Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver." *Id.* at 312. Thus, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314. In other words, the *Miranda* warning "conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Id.* at 311 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

Holding in *Elstad* that the defendant's post-*Miranda* statements were not rendered involuntary by his unwarned statements, the Supreme Court distinguished between "technical" *Miranda* violations and other "actual" violations of the Fifth Amendment's prohibition on compelled self-incrimination. *Id.* at 314, 318.

The Supreme Court thus established in *Elstad* that, while *Miranda* requires that an unwarned yet voluntary admission must be suppressed, "the admissibility of any subsequent [warned] statement should turn on these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309. In short, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntar[y]." *Id.* at 318. Accordingly, as with any such inquiry, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.*

...

Nearly two decades later, the Supreme Court decided [*Missouri v.*] *Seibert* against the backdrop of the *Elstad* decision. *Seibert* recognized, as explained below, a narrow exception to *Elstad* "applicable only in the infrequent case" where the police have used "a two-step questioning technique based on a deliberate violation of Miranda." *Seibert*, 542 U.S. at 620-22, (Kennedy, J., concurring in judgment) (emphasis added).

In *Seibert*, after her bedridden son, Jonathan, died in his sleep, Seibert feared charges of neglect. She was present when two of her other sons discussed burning her family's home and incinerating Jonathan's body in order to conceal the circumstances of his death. As part of the plan, Donald, an unrelated mentally ill teenager living with the family, was to be left in the home in order to avoid the appearance that Jonathan had been unattended. The fire was then set, resulting in Donald's death. 542 U.S. at 604.

Seibert was later arrested, but on instructions from Officer Hanrahan, the arresting officer did not give *Miranda* warnings to her. Seibert was taken to an interview room in the police station, where Hanrahan questioned her for 30 to 40 minutes without *Miranda* warnings. *Id.* at 604-05. During that time, Hanrahan squeezed Seibert's arm and repeated "Donald was also to die in his sleep [in the house fire that was set]." *Id.* at 605. Seibert finally confessed that the plan was for Donald to die in the fire. At that point, Hanrahan gave her a 20-minute break, returned and administered *Miranda* warnings, and obtained a signed waiver. He then resumed his questioning, confronting Seibert with a litany of her unwarned inculpatory statements to which she repeated the earlier information. *Id.*

After being charged with first-degree murder for her role in Donald's death, Seibert moved to suppress both her unwarned and warned statements made to Hanrahan.

> At the suppression hearing, Officer Hanrahan testified that he made a "conscious decision" to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." He acknowledged that Seibert's ultimate statement was "largely a repeat of information ... obtained" prior to the warning.

*Id.* at 605-06.

A Missouri state trial court excluded Seibert's unwarned statements but admitted her warned statements, and Seibert was convicted of second-degree murder. The Missouri Court of Appeals affirmed, viewing the case as indistinguishable from *Elstad. Id.* at 606. In reversing, the Missouri Supreme Court held that "in the circumstances here, where the interrogation was nearly continuous, ... the second statement, clearly the product of the invalid first statement, should have been suppressed." *Id.* (citation omitted). The court reasoned that "Officer Hanrahan's intentional omission of a *Miranda* warning was intended to deprive Seibert of the opportunity knowingly and intelligently to waive her *Miranda* rights." *Id.* (citation omitted). The court distinguished *Elstad* on the ground that the *Miranda* warnings had not been intentionally withheld in that case. *Id.* (citation omitted).

On appeal to the United States Supreme Court, the Court affirmed the Missouri Supreme Court in a split decision, holding that the interrogation technique used in the case "undermine[d] [Seibert's] *Miranda* warnings," thus rendering her post-warning inculpatory statements inadmissible. *Id.* at 616 (Souter, J., plurality opinion); *id.* at 618 (Kennedy, J., concurring in judgment). Justice Souter, in authoring the plurality opinion, was joined by three other Justices, including Justice Breyer, who also authored a concurring opinion. Justice Kennedy, with his separate concurrence, provided the fifth vote to affirm.

Under the Supreme Court's settled principles of stare decisis, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) ); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) ("When there is no majority opinion, the narrower holding controls."). "Because *Seibert* is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006) (citing *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1136 n.6 (11th Cir. 2006) ); see *also United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010); *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007); *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006); *but see United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015) (applying Justice Souter's plurality opinion as controlling).

Justice Kennedy viewed the plurality's approach to the admissibility issue as "cut[ting] too broadly" in calling for an "objective inquiry from the perspective of the suspect" in both intentional and unintentional two-step interrogations, using a multifactor test. *Seibert*, 542 U.S. at 621-22 (Kennedy, J., concurring in judgment). Such an approach would undermine the Court's "balanced and pragmatic approach to enforcement of the *Miranda* warning" established in *Elstad*. *Id.* at 620. Describing circumstances in which it would be "extravagant" to conclude that a deliberate two-step technique had been used, Justice Kennedy explained that "[a]n officer may not realize that a suspect is in custody and warnings are required. The officer may not plan to question the suspect or may be waiting for a more appropriate time. Skilled investigators often interview suspects multiple times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection." *Id.* at 620.

Narrowing his focus upon the "deliberate" circumvention of *Miranda*, *id.* at 620, Justice Kennedy believed that the admissibility of post-warning statements "should continue to be governed by the principles of *Elstad*" except "in the infrequent case, such as we have here, in which the two-step interrogation

technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622. In his assessment, the police in *Seibert* deliberately withheld the *Miranda* warning "to obscure both the practical and legal significance of the admonition when finally given." *Id.* at 620.

Under Justice Kennedy's subjective-intent based test, in such cases where "an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621. The sufficiency of the curative measures, some of which Justice Kennedy proposed, would depend upon their capacity to "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning." *Id.* at 622. In *Seibert*, however, no curative measures were taken, "so the postwarning statements [were] inadmissible and the conviction [could not] stand." *Id.*

...

In addressing Secret's challenge to the trial court's finding that Special Agent Lazear did not engage in a deliberate two-step interrogation technique proscribed in *Seibert*, we consider as a matter of first impression the appellate standard applicable for review of this finding. We conclude, as the Virginia Court of Appeals has concluded in addressing the same issue, that the *Seibert* "deliberateness finding is appropriately reviewed as a factual finding." *Kuhne v. Commonwealth*, 61 Va. App. 79 (2012) (quoting *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th Cir. 2007)); *see also Mashburn*, 406 F.3d at 309. Accordingly, in reviewing this finding, we will apply "the standard applicable to appellate review of determinations of fact by a trial court," and "that is, whether the finding is 'plainly wrong or without evidence to support [it].'" *DeMille v. Commonwealth*, 283 Va. 316, 323 (2012) (quoting *Commonwealth v. Squire*, 278 Va. 746, 751 (2009)); *see Commonwealth v. Hilliard*, 270 Va. 42, 49-50 (2005). Furthermore, the burden rests with Secret to establish that the denial of his suppression motion was reversible error. *Branham v. Commonwealth*, 283 Va. 273, 279, 720 S.E.2d 74 (2012); *Sidney v. Commonwealth*, 280 Va. 517, 522 (2010); *Harris v. Commonwealth*, 276 Va. 689, 695 (2008).

The trial court's ultimate factual finding that Lazear did not deliberately use an improper two-step interrogation technique when interviewing Secret is neither plainly wrong nor without evidence to support it. At the suppression hearing, the court heard and credited Lazear's explanation as to why he did not believe Secret was in custody when Lazear met with him at the Sheriff's Office for the interview, but instead thought Secret was there "on his own accord" and willing to speak. It was for that reason, the court found, that Lazear understandably did not administer *Miranda* warnings to Secret when the interview began, doing so only later into the interview when Secret began to provide inculpatory information about the fire at Heartwood. The record also supports the court's additional

subsidiary finding that at no time during the prewarning phase of the interview was there any "element of coercion whatsoever." Finally, the court credited Lazear's testimony that he had not been trained in, nor was he familiar with, the two-step interrogation technique.

These findings establish precisely one of the above-described scenarios that Justice Kennedy posited in *Seibert* as qualifying for review under *Elstad*—i.e., a police officer, who is unaware that the suspect is "in custody," receives an unwarned and yet non-coerced inculpatory statement during an interview followed by a warned inculpatory statement, without any deliberate attempt on the part of the officer to circumvent Miranda with a "question first" interrogation strategy. *See Seibert*, 542 U.S. at 620; *see also United States v. Stewart*, 536 F.3d 714, 721 (7th Cir. 2008) (police officer's subjective belief regarding defendant's custodial status was relevant to evaluation of his reasons for not initially giving *Miranda* warnings).

For these reasons, like the trial court, we reject Secret's central argument that Lazear's conduct falls within *Seibert*'s proscription because Lazear allegedly chose "to remain willfully ignorant of the numerous objective, readily discernable facts indicating Secret's in-custody status." (Appellant's Br. 44). Such conduct, Secret asserts, equates with the employment of an intentional and coercive two-step interrogation tactic. Nothing in Justice Kennedy's concurrence in *Seibert* supports such an approach, where he indeed explicitly rejected the adoption of an "objective inquiry." *Seibert*, 542 U.S. at 621. In addition, the assertion that an interrogator unwittingly used some deliberate strategy is a contradiction in terms. Because the trial court's factual finding that Lazear did not employ a deliberate two-step interrogation strategy has ample evidentiary support, that finding is dispositive.

...

Next, we consider Secret's alternative argument that the trial court erred in admitting his post-Miranda warning statements because they were not knowingly and voluntarily made based upon the *Elstad* totality-of-the-circumstances standard. We disagree.

For purposes of a Fifth Amendment self-incrimination challenge, "[v]oluntariness is a question of law, subject to independent appellate review." *Avent v. Commonwealth*, 279 Va. 175, 195 (2010) (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268-69 (1995)). "Subsidiary factual questions, however, are entitled to a presumption of correctness." *Id.* (quoting *Midkiff*, 250 Va. at 268). *See Miller v. Fenton*, 474 U.S. 104, 112-17 (1985) (addressing standard of review for "voluntariness" of confession and cited by this Court in *Midkiff*); *see also Burket v. Commonwealth*, 248 Va. 596, 611 (1994) (citing *Miller*); *Mueller v. Commonwealth*, 244 Va. 386, 394 (1992) (same); *Williams v. Commonwealth*, 234 Va. 168, 172 (1987) (same); *Gray v. Commonwealth*, 233 Va. 313, 324

(1987) (same). Accordingly, as to those subsidiary factual findings, we will again apply the above-stated standard of review: whether those findings are "'plainly wrong or without evidence to support [them].'" *DeMille*, 283 Va. at 323 (quoting *Squire*, 278 Va. at 751).

The test for determining voluntariness is whether the statement was the "product of an essentially free and unconstrained choice by its maker," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973), or "induced by such duress or coercion that the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'" *United States v. Locklear*, 829 F.2d 1314, 1317 (1987) (quoting *Schneckloth*, 412 U.S. at 225); *see Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate" to finding a confession constitutionally involuntary). In determining whether a defendant's will was overborne by police coercion, "courts look to 'the totality of all the surrounding circumstances,' [*Schneckloth*, 412 U.S.] at 226, including the defendant's background and experience and the conduct of the police, *Correll v. Commonwealth*, 232 Va. 454, 464 (1987)," *Avent*, 279 Va. at 195 (quoting *Midkiff*, 250 Va. at 268)—i.e., the *Elstad* standard.

From our review of the record, we conclude, as did the trial court, that the totality of the evidence establishes that Secret's post-*Miranda* warning inculpatory statements to Lazear were knowingly and voluntarily made. The record more than sufficiently supports the trial court's subsidiary factual findings upon which that conclusion is based. Most significantly, the evidence supports the trial court's finding that at no point in the interview, either before or after administration of the *Miranda* warnings, was there any "element of coercion whatsoever" on the part of Lazear that caused Secret to confess. In short, Secret's statements were "not the product of coercion," the court found. Consistent with this finding, the record also supports the court's related specific findings that Lazear neither explicitly nor implicitly threatened Secret, that Lazear did not seek to exploit Secret's previous unwarned statement, and that the evidence established that Secret was not under the influence of drugs or alcohol, or otherwise impaired.

Thus, there is nothing to suggest that Secret's post-*Miranda* statements were anything but the "product of an essentially free and unconstrained choice" as a constitutional matter, *Schneckloth*, 412 U.S. at 225, Secret's contentions to the contrary notwithstanding. In challenging the voluntariness of his post-warning statements, Secret relies heavily on what he claims was his "altered mental state" at the time of his interview with Lazear, as allegedly evidenced by some of his "bizarre" comments during the interview. Appellant's Br. at 36. As support for this argument, Secret cites *Connelly*, 479 U.S. at 164, for the proposition that an accused's mental condition is relevant to "his susceptibility to police coercion." *Id.* Secret's reliance on Connelly, however, is not compelling. The trial court here *found* that, despite Secret's "bizarre" comments in the course of his interview, Secret was not impaired, received and understood his *Miranda* rights, waived those rights, and then "knowingly and voluntarily" made his warned

14

inculpatory statements. Those findings are supported by the evidence. There is simply nothing in the record to support the contention that Secret's bizarre comments, in and of themselves, established that he was suffering from some kind of "altered mental state" that negated his statements as an "act of free will" in the context of the Fifth Amendment. *Elstad*, 470 U.S. at 311 (quoting *Wong Sun*, 371 U.S. at 486).

Record No. 170540, pp. 749-761.

Having reviewed the trial and appellate state court records as well as relevant federal law, this Court concludes that the Supreme Court of Virginia's treatment of Secret's arguments and its ultimate declination thereof was thorough, rested on a reasonable interpretation of the facts, and was not contrary to established federal law.

Federal courts reviewing § 2254 petitions raising Seibert arguments similar to Secret's have declined to disturb state court rulings even where those federal courts cast significant doubt as to the basis of the state court decisions. See, e.g., Morse v. Nev. Attorney Gen., 687 F. App'x 662, 663-64 (9th Cir. 2017) (declining to disturb state court Seibert analysis even where state court applied different standard than Justice Kennedy's "deliberate two-step [interrogation] strategy" analysis, which was accepted as controlling in the Ninth Circuit); Eubanks v. Pfeiffer, No. 15-1196, 2017 WL 3600414, at *14-15 (C.D. Cal. July 27, 2017) (finding that, because state court's determination that officer did not deliberately employ a two-step interrogation was a factual determination and was not "actually unreasonable" it was entitled to deference despite significant evidence contradicting such a finding) (report and recommendation adopted by No. 15-1196, 2017 WL 3588743); Johnson v. Warden, Attica Corr. Facility, No. 16-cv-5977, 2017 WL 56242272, at *1 (S.D.N.Y. Nov. 20, 2017) (finding that petitioner failed to satisfy Justice Kennedy's test when he neglected to provide in his § 2254 petition any evidence or argument contradictory of state court's determination that investigating detectives did not intend to sidestep Miranda through use of two-step interrogation).

The Supreme Court of Virginia's decision with respect to petitioner's Elstad claim is similarly entitled to deference. The state courts determined that petitioner's post-Miranda statement was admissible because, in interrogating petitioner, Lazear did not act coercively, issue threats, or seek to exploit petitioner's initial statement, and because petitioner was not under the influence of any alcohol or drugs. These factual determinations are supported by the record and entitled to deference. This Court, then, like others confronted with similar § 2254 claims, declines to disturb the state court's determinations and decision with respect to this issue. Cf. Parsad v. Greiner, 337 F.3d 175, 179 (2d Cir. 2003) (upholding state court finding that petitioner's post-Miranda statement was voluntary and that petitioner was not "in such a state of intoxication that he could not understand what he was doing" despite having consumed beer and rum prior to questioning); Mohammed v. Jones, No. 01-cv-72422-DT, 2002 WL 1009718, at *6-7 (E.D. Mich. 2002) (upholding state court determination that petitioner's admission was voluntary on the basis that he was "not intoxicated … and … was read his constitutional rights before he gave each statement").

As stated above, petitioner's decision to submit his state appellate brief in place a newly-drafted brief tailored to a § 2254 AEDPA analysis did him no favors with respect to the resolution of Claim One. His submitted brief supplied this Court with arguments and authority already reasonably rejected by the Virginia state courts. In resubmitting the document, Secret neglected to present novel arguments or legal citations that might demonstrate that the state courts' decisions were contrary to federal law or otherwise unreasonable. Having failed to unearth any such contradictory authority itself, this Court finds that, under the deeply deferential standard of § 2254(d), petitioner has failed to demonstrate an entitlement to provision of relief with respect to Claim One. Consequently, the claim is denied.

16

2.   ***Claim Two – Sufficiency of the Evidence***

Petitioner next asserts that, as to his attempted murder convictions, the evidence presented at trial was insufficient to prove his guilt beyond a reasonable doubt with respect to the element of intent. See Dkt. No. 1.  On direct appeal, both the Court of Appeals of Virginia and the state supreme court denied petitioner's sufficiency claim. See Record Nos. 0853-15-2, 170540.  Having reviewed the state court records, this Court fails to detect an unreasonable application of law or determination of facts in the state courts' decisions, see 28 U.S.C. § 2254(d)(1)-(2), and concludes that petitioner's claim does not entitle petitioner to relief.

Federal habeas petitions that assert there was insufficient evidence to support a state court conviction should be granted only if "no rational trier of fact could have found proof of [petitioner's] guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). A federal court may only overturn a state court decision if that decision was "objectively unreasonable;" it may not overturn the decision simply because it disagrees with the outcome. Cavazos v. Smith, 565 U.S. 1, 3 (2011) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). Indeed, a reviewing federal court must ask whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)).

In Virginia, "[i]n the context of attempted murder, the evidence must show specific intent to kill the victim." Commonwealth v. Herring, 288 Va. 59, 77 (2014) (quoting Va. Code § 18.2-32). "Intent may be, and most often is, proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." Viney v. Commonwealth, 269 Va. 296, 301 (2005) (citation omitted).  Moreover, "[i]t is permissible for the fact finder to infer that every

17

person intends the natural, probable consequences of his or her actions." Commonwealth v.

Perkins, 295 Va. 323, 330 (2018) (citation omitted).  The Supreme Court of Virginia summarized

the evidence a jury could have considered and stated the following in support of its denial of the

sufficiency claim:

> Here, we conclude the evidence was sufficient to support the jury's finding that
> Secret possessed the requisite intent to kill the nine individuals located within
> Heartwood when Secret started the fire there, based on both direct and
> circumstantial evidence.
>
> At that time, Secret had been residing in a tent on the Acorn property for six
> weeks, sharing meals at Heartwood, and attending weekly meetings.  He was also
> told that there was no room for him to reside at Heartwood or one of its other
> facilities.  The jury could thus infer that Secret obviously knew Heartwood served
> as an Acorn dormitory.  Also, Secret was becoming increasingly frustrated with
> Acorn's members during his stay there, as the trial court noted in ruling on
> Secret's motion to strike.
>
> It is undisputed that Secret set the fire in the kitchen at Heartwood around 5 a.m.
> when a number of residents would presumably be asleep.  Moreover, before doing
> so, Secret admitted, he "put a lot of fuel around," consisting of gasoline and diesel
> fuel.  Not only did he pour the fuel along the first floor hallway near the bedrooms
> and the office where Calta was working early that morning, but he also placed
> two cans of fuel in the dining room, which would have accelerated the fire.
> Secret also admitted that while "dump[ing]" the fuel, he saw Calta in the office
> and heard people "walking around." After seeing Calta, Secret explained, "I was
> trying to [walk] ginger[ly], but at that point I was bookin' it.  Like I … had a plan,
> like, to … dump fuel, dump fuel, dump fuel, light, but I didn't really follow
> through on the last dumping of fuel, probably because [Calta] was in the computer
> room." As Secret subsequently described it, "there was so much fuel everywhere
> I was like, 'Ah, God!'  In seconds, [Calta] was about to start smelling all the fuel.
> I knew that.  I was like, 'I gotta get the f**k outta here quick!'" At that point,
> Secret grabbed two sets of car keys from the pantry, started the fire, and fled into
> the woods after trying but failing to start two different automobiles located
> nearby.  Describing his emotions to Lazear, Secret stated that, immediately after
> setting the fire, he thought to himself: "Jesus! I'm the worst! How could I do …
> what was I f**king thinking?"
>
> Based on this evidence, it was entirely rational for the jury to find that Secret
> intended to kill the nine individuals located within Heartwood at the time of the
> fire, as the natural and probable consequence of his actions was that everyone
> there would be consumed by the fire but for their fortuitous escape.

Record No. 170540, pp. 763-64.

On the basis of this evidence, this Court concludes that, with respect to the element of intent, the only element petitioner challenges, the evidence presented to the jury was sufficient such that a "rational trier of fact could have found [proof of that element's existence] … beyond a reasonable doubt." See Jackson v. Virginia, 443 U.S. 307, 319 (1979). Indeed, a jury could easily infer that, aware as he was of the presence of Calta and other individuals who were likely to have been sleeping in Heartwood, Secret knew that the natural and probable consequence of his actions was that the inhabitants of Heartwood would be killed by the fire he set. Accordingly, Claim Two will be denied.

### 3.     *Claim Three – Denial of Proffered Jury Instruction*

In Claim Three, petitioner argues that the trial court wrongly denied his proffered jury instruction, which read, "To do an act with intent to commit one crime cannot be an attempt to commit another crime, although it might result in such other crime." See Dkt. No. 1-1, p. 74. Petitioner suggested that such an instruction was necessary to instruct the jury that it could not infer the specific intent to kill solely based on the intent to commit arson. Id. As stated above, the Court of Appeals of Virginia denied this claim on direct appeal, and petitioner failed to renew it for his appeal to the Supreme Court of Virginia. See Record Nos. 0853-15-2, 170540. This claim, like petitioner's others, does not entitle petitioner to relief and must be dismissed.

First, this claim fails because questions respecting jury instructions are, generally speaking, matters of state law and do not rise to a constitutional magnitude unless those instructions are so fundamentally unfair as to impugn due process. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); Grundler v. North Carolina, 283 F.2d 798, 802 (4th Cir. 1960). This Court fails to detect, and petitioner does not argue that the trial was tainted by, unfairness as a

19

result of the denial of the proffered instruction. Petitioner's requested instruction derived from Thacker v. Commonwealth, 134 Va. 767 (1922). The proffered instruction, in fact, constitutes an exact quotation from that case. The trial court nevertheless found the requested instruction "misleading" because it suggested that a person could not hold two intents at the same time. Record No. 170540, pp. 498-513. Despite declining to utilize this instruction, the trial court separately instructed the jury of the specific intent element relevant to the charges of attempted murder. See id. at p. 525. As stated by the Court of Appeals of Virginia in its denial of this claim, "The law was clearly stated, and the instructions covered all issues raised by the case. Accordingly, the circuit court did not err by refusing jury instruction 18." Record No. 0853-15-2. This Court thus concludes that the trial court did not deny petitioner a fair trial by refusing to give the requested jury instruction. As a result, this claim fails.

Even if this claim were theoretically meritorious, however, it would be barred from review due to petitioner's failure to raise it on appeal to the Supreme Court of Virginia. This is so because petitioner would be barred from raising this claim if he attempted to do so now and thus could not satisfy the exhaustion requirement necessary to earn federal review of a habeas claim. See Slayton v. Parrigan, 215 Va. 27 (1974) (if claims are not raised on direct appeal, they generally cannot be raised in state habeas proceedings unless petitioner also raises an ineffective assistance of counsel claim in the habeas proceedings); Va. Code § 8.01-654(A)(2) ("A habeas corpus petition attacking a criminal conviction or sentence ... shall be filed within two years from the date of final judgment in the trail court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later."). The claim is thus procedurally defaulted and must be denied.

## V.  Conclusion

For the foregoing reasons, petitioner's federal habeas claims lack merit.  Consequently, respondent's motion to dismiss shall be granted, and this petition will be dismissed with prejudice through an order that will issue alongside this memorandum opinion.

Entered this _26_ day of _June_ 2020.

Alexandria, Virginia

_____ /s/
Liam O'Grady
United States District Judge

Liam O'Grady
United States District Judge